All right, our last case for today is Dittmann v. Quest Diagnostics. Mr. Zamudio. May it please the court, counsel. My name is Dan Zamudio, and I represent Mr. William Dittmann, who is the appellant in this case. Mr. Dittmann sued Quest Diagnostics in federal district court. He alleged violations under Title VII. Can you raise your voice a little bit, counsel? I'm sorry, sir. I'm a very old man. If you can raise your voice a little bit, I'd appreciate it. I will do so, Judge Bauer. Thank you. Again, Mr. Dittmann sued Quest Diagnostics in federal district court. He alleged violations under Title VII, the 80 AAA, GINA, age discrimination, and several state privacy laws. His case was decided against him on Quest's motion to dismiss. He is asking this honorable court to review that dismissal and overturn it and send it back to the district court. The question for the court is whether Mr. Dittmann's complaint should have survived a motion to dismiss. There's no question that Mr. Dittmann works for Xerox, and I would note that Xerox has gone through several name changes. As of today, it is called Conduit, but for sake of simplicity, I'll continue to call it Xerox. The complaint, real question is whether Quest Diagnostics is Mr. Dittmann's employer, his de facto employer under Title VII of the Civil Rights Act. But, you know, I had trouble imagining how Quest Diagnostics in any way was his employer, as opposed to simply an agent of Xerox that they use for a particular purpose. You know, they maybe employ people to landscape the building, you know, that they're in. They employ people perhaps to do payroll. They employ people to handle benefits. I'm sure they employ outside firms for any number of purposes, but nobody thinks that these particular purpose outside entities are an agent in the sense that dual employment law thinks of an agent. I just don't see any limit to your theory. Your Honor, I think that there is a limit. In this case, the facts played in the complaint show that Quest Diagnostics itself controlled an important aspect of Mr. Dittmann's employment benefits. We aren't looking at a situation where an agent was acting and were trying to bring the agent under liability for the employer's acts. These acts are Quest Diagnostics acts. Well, suppose there were a company, Company A, which handles payroll. And part of the job for Company A is to keep track of the employee's personal days and vacation days and uses of these things. And they, as you have to do, they make computations. So their computations have an effect on the employee's salary. Sometimes there are disagreements about whether something was validly done as a personal day or not. But I really don't see how that makes my Company A an agent either for employment in the sense of being a joint employer. I think, Your Honor, according to that hypothetical, if the accounting firm were doing the transactions for an employer... Yeah, they are. They're keeping track of each employee's days worked in the year. And that has a direct effect on the paycheck that's sent home. Sure. And if the employee wanted to have access to that agent to correct a mistake and that agent refused access, then it would be a problem for the agent. I think, Your Honor, that the facts of Mr. Dittman's case go along that line. Is Xerox the one that makes the decision what to do with this information about the tobacco surcharge? Quest just gives them the information, like in Judge Wood's example of the accounting firm. The employer decides what to do with it. Thank you, Judge Barrett. I want to note that Xerox definitely controls aspects of this health benefits program. Well, like the most important aspect. They want this carrot and stick approach about smoking cessation. So, in a sense, there's a higher level for everybody, except people get money lopped off if they can show that they're nonsmokers. You're right. If Mr. Dittman didn't show that he was a non-tobacco user, he had a wage deduction on his payroll. Yeah, the $500. This is a Xerox policy, though. Quest didn't tell Xerox it had to do that. It is a Xerox program. Xerox manages this program through a website called Benefits Web. It requires the participating employees to go from that website.  So, there is this interaction between Quest and Xerox and definitely an agency relationship. As far as Xerox determining that this is its policy, I think that Quest determined its own policies that affected Bill Dittman. He wanted nothing to do, first of all, about Bill Dittman. He is a senior development systems specialist with Xerox. He understands computers. He understands how data is shared amongst entities. Deathly afraid of it. He did not want to participate in the wellness program of Xerox because it asks too many personal medical questions. And he didn't have to, as long as he was willing not to get the discount.  He didn't get the incentive. He was okay with that. He didn't want anything deducted from his wage, however. So, he said, I do want to show them that I'm not a non-smoker. So, he asked Xerox, can I just provide a nicotine-only test? Xerox said, well, you know, we don't know how you do it. You've got to ask Quest. And he did. He asked Quest on the phone. He said, can I take just a nicotine-only test? I don't want my wages deducted. I'm not a smoker. And they said, no, you can't do that unless you also give us a medical questionnaire and answer all of these medical questions. Well, because they're the experts, and so maybe that's not good enough for figuring out whether someone's a smoker or not. But still, Xerox could have said, you know what, we understand your concerns, your privacy concerns, and so we are going to say it's okay. Xerox had the authority to do that. Xerox could have said, we'll exempt you from the requirement. It's not Quest's adherence to particular laboratory standards doesn't make it its employer. And I might add that a nicotine-only test, for all I know, might tell you that somebody's a vapor, but maybe not that they're a smoker, because there are all sorts of other tars and nasty things that get involved with actual tobacco smoking. I mean, just as to say, there could have been a rational reason, but I think Judge Barrett made the important point, which is that it was entirely up to Xerox whether this reduced level of testing would be satisfactory. And, Judge Barrett, that is correct. Xerox could have done something to accommodate his request to take just a nicotine test. They didn't. He filed an appeal internally with Xerox, and Xerox ignored it. So the next thing Mr. Dittman said was, okay, well, in their literature, they're telling me to go visit a Quest clinic. So he did. He works in Crown Point. There happens to be a Quest clinic in Crown Point. He went there and asked the employees, can I take just a nicotine-only test? They said, no, you can't do that. You've got to take the wellness test. You've got to go on the computer. He said, listen, all I want to do is do this, and I look at the questions on the questionnaire. And they said, nope, you can't do that. You've got to get it on the computer. He said, okay, I've got a prescription, cotinine test. It will tell you whether I'm a tobacco user. Can you do this? They said, yes, here's a price for doing it. Will you submit it to Xerox? No, we can't do that. You've got to do our form. Okay, well, you look at the form. We've got very little time left. Your Honor, may I have more time for inquiring or answering your inquiries? Why don't you stop now, and I think we see where you're going with this, and we'll save the rest for rebuttal. Thank you. Mr. Steele. May it please the Court and counsel. Kevin Steele from Burke, Costanza, and Carberry on behalf of Defendant Appelli, Quest Diagnostics, Incorporated. I think that your Honor's questions have really struck the right chord in this case, in that Quest's role in this case was to simply administer a Xerox program. I would point out that the only way that there can be liability under Title VII or GINA or the ADA to Quest in this case is if they're found to be an agent of the employer with a significant control over an important aspect of employment under the Allum case. And we don't have that here. What we have here is that Quest administers this wellness program. Now, what the plaintiff always wants to look over is that there were three ways for him to avoid the tobacco surcharge in this case. The first way was to go through the testing from Quest as part of the wellness program. The second way was to enroll in a smoking cessation program that another entity provided to Quest employees. The third way that he could have avoided the charge was to go to his own doctor and fill out a physician form that was to indicate to Xerox that he was not a smoker. So there were avenues available to Mr. Dittman that had nothing to do with participation in the Quest wellness program. And so when you look at the situation here, when you look at the five-factor test under HODGENACCHI where you run through the factors to decide whether or not Quest is potentially the employer of Mr. Dittman, it's clear that Quest is not an employer of Mr. Dittman. All Quest did was to run the employee wellness program for Xerox, for its employees, and to achieve the result that Mr. Dittman wanted, which was to not participate in the wellness program and to avoid the tobacco surcharge. Well, I think, actually, don't you need to add number three to maintain personal information off the grid, so to speak? It seems that his real complaint is that these questionnaires, I don't know, delve into whatever illnesses he's ever had in his life, and I don't know what else they do. But too much information, essentially, is his complaint, isn't it? Well, that is his complaint, Your Honor, and, of course, being on a motion to dismiss, those factors were never gotten into. But I think that the important point is that the recourse that he wanted to avoid the tobacco surcharge and to not participate in the wellness program was available to him as a part of it and was indicated in the supplemental appendix at page 37, that there was the choice to have your doctor fill out a health assessment form to indicate that you are not a smoker, and then you avoided the tobacco surcharge, which, of course, Quest did not charge him. That was Xerox that would charge him that form. So I believe, Your Honor, that the goal was achievable, the stated goal of not responding to various health questions and avoiding the tobacco surcharge was available to Mr. Dittman. And for whatever reason, he chose not to take that path. Was this wellness program exclusively focused on tobacco, or was it a broader program about a certain number of hours of exercise a week or a diet or anything else? I believe, Your Honor, again, there's nothing in the record with regard to that, but I believe that the wellness program itself was focused on additional health factors over and above the tobacco surcharge. But the statement from Mr. Dittman was that he was fine with not participating in the wellness program and receiving the additional benefit. Where his complaint centered on was the tobacco surcharge, which has changed during the course of the case. Is that a yearly or a monthly? I can't remember whether- That's an annual. An annual, 500 annually. Correct. Or whatever it is now. Yeah, I think it's varied, I think, during the course of this case from about $400 to $600 a year that Xerox charges its employees who are smokers. But the important aspect is that for the claims, because the court, once it got rid of the federal causes of action, it relinquished supplemental jurisdiction, that to impose liability upon Quest Diagnostics for those causes of action, that the Quest Diagnostics has to be found to be Mr. Dittman's employer. And when you look at the factors, those factors are not present. Quest Diagnostics should not be found to be Mr. Dittman's employer for liability under those causes of action. And we believe that the district court's dismissal should be affirmed. I waive the rest of my time unless there are any questions. I see none, so thank you very much. You have about a minute, Mr. Zamudio. Thank you. Why didn't Mr. Dittman use the form? Because you had to download it from Quest Diagnostics' website. What happened when he went to Quest Diagnostics' website? The website said, before you get in, I want you to allow us to put an electronic cookie on your computer so we can share your information with unknown third parties. We want you to consent that we can share your medical information with unknown third parties. We want you to submit to the jurisdiction of New Jersey. We want you to indemnify us. So Mr. Dittman didn't get the form. We happen to have it as an exhibit. If you look at the exhibit of the form, it shows all of this other information that is mandatory and one little checkbox for nicotine use. So he had to provide blood samples, doctor's names, e-mails, addresses, cholesterol levels, stuff that didn't pertain to the nicotine test. With that, we know that Quest controlled the means, the stuff that Mr. Dittman would use to access this employee benefit. It's 21st century data, and we're asking the court, because the district court judge expressed some confusion in his decision, we're asking the court to review it and overturn his dismissal and send it back to the trial court. Thank you. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement, and the court will be in recess.